

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BECOME NEW INVESTMENTS, L.L.C., | § | No. 08-24-00106-CV |
| Appellant, | § | Appeal from the |
| v. | § | 98th District Court |
| ASHLEIGH EMMETT, | § | of Travis County, Texas |
| Appellee. | § | (TC# D-1-GN-23-004385) |

**DISSENTING OPINION**

As the Texas Supreme Court described, "[a]rbitration is a creature of contract between consenting parties." *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 629 (Tex. 2018). Consequently, it is generally enforced only between signatories of a valid contract. Nevertheless, there are times and circumstances when non-signatories can be compelled to arbitrate, or they may compel others to arbitrate, under legal theories based on contract law and agency principles. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding). Those theories include incorporation by reference, third-party beneficiary status, and estoppel, among others. *Id*. Become New Investments, LLC (BNI) argued that Ashleigh Emmett could be compelled to arbitrate, not because the contract she signed included an arbitration provision, but rather, because an arbitration provision was included in a separate, unsigned

document that BNI intended to make a part of the home purchase transaction, and because Ashleigh later sought repairs for her newly-built home. Because BNI's subjective intent does not override the objective contract terms, and because Ashleigh's conduct does not implicate principles of contract and agency law, I would affirm the trial court's order denying BNI's motion to compel arbitration. Because the majority concludes otherwise, I respectfully dissent.

## I. CAN THE NEW HOME CONTRACT AND THE CENTRICITY WARRANTY BE READ TOGETHER AS ONE CONTRACT?

In construing a contract, "our primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). Said more expansively, "[a] written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). Facts and circumstances may be considered to give context to the parties' transaction, or to inform the contract text, but the parol-evidence rule precludes consideration of evidence that renders a contract ambiguous when the document on its face is capable of a definite legal meaning. *Id.*

Where appropriate, written contracts executed in different instruments—whereby a single transaction or purpose is consummated—are to be taken and construed together as one contract. *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020). To this extent, courts may determine that multiple separate contracts, documents, and agreements "were part of a single, unified instrument." *Id.* at 94. Important for our purposes, if the two agreements are construed together as one unified contract, then an arbitration clause in one of the agreements will be applied to any disputes arising out of the unified contract. *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (orig. proceeding) (finding that two separate documents which were related to the sale of a drilling rig could be read

2

together as a single contract and the court could enforce a forum-selection clause contained in only one of the documents). On the other hand, if the two instruments cannot be construed together to form one unified contract, an arbitration clause contained in one of the instruments will not be applied to the other. *See Rieder*, 603 S.W.3d at 96, 102 (holding that without evidence to the contrary, two instruments cannot be considered as a single, unified contract when the two agreements are executed by different parties, deal with separate situations, impose distinct obligations, and are governed by different law). Notably, when applying this doctrine, the Texas Supreme Court has advised courts to proceed with caution and bear in mind that "tethering documents to each other is simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation." *Id.* (citing *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

Ashleigh sued BNI on the New Home Contract, the agreement she and her husband, Daniel, had signed to purchase their newly-built home. She alleged breach of contract and implied warranties, negligence, deceptive trade practices, and sought a declaratory judgment that she had not waived any implied warranties, including the implied warranty of good and workmanlike construction, adequate supervision of construction, and the implied warranty of habitability; and that she was not subject to the limitations of the Centricity Warranty. In moving for arbitration, BNI argued the Centricity Warranty was part and parcel of multiple documents memorializing a unified transaction—the sale and purchase of the residence—and Ashleigh's conduct before, during, and after the purchase confirmed that she agreed to the warranty. It thus maintained the two documents, the New Home Contract and the Centricity Warranty, should be construed together as if one, singular agreement. Ashleigh countered that only Daniel signed the Centricity application, which required signatures of all parties including BNI, and it only contained an acknowledgement that final warranty documents would be mailed to their property address and

3

those documents would contain binding alternative dispute resolution provisions. Because the conditions of formation were not met, she urged the Centricity Warranty never became effective.

After reviewing the language of both documents, and the facts and circumstances surrounding their execution, I would hold that the New Home Contract and the Centricity Warranty are not components of a single, unified instrument.

### A. Contract terms

The parties to the New Home Contract are BNI, and Ashleigh and Daniel. All three of them signed the agreement providing for the sale of the home for the purchase price of $3.8 million. The New Home Contract addressed the sales price, how title to the property would be conveyed, when construction would be substantially completed (in accord with construction documents), and it provided further terms pertaining to the closing of the sale. Noticeably absent from the New Home Contract is any mention of contractual arbitration. The only reference to warranties occurs in section 7(f), which states: "WARRANTIES: Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties."

The Centricity Warranty, a multi-page document, purports to be a 1-2-10 warranty with a $1 million warranty limit. That lengthy document has no signatures whatsoever. Instead, it states that both the warranty document and the warranty coverage application, which is composed of a single page with a reverse side, together form the entire warranty contract. The top of the pre-printed application instructed an applicant or joint applicants: "THIS APPLICATION IS TO ENROLL YOUR NEW HOME IN CENTRICITY EXPRESS LIMITED WARRANTY COVERAGE; IT IS NOT YOUR NEW HOME WARRANTY . . . UNLESS ALL BLANKS ARE COMPLETED, THE APPLICATION IS SIGNED, AND THE WARRANTY FEE IS PAID, YOUR HOME WILL NOT BE ENROLLED." On the reverse side, appearing after multiple signature lines, the document informs individual or joint applicants: "I/we will have 30 days to review the warranty terms and conditions and return it for cancellation if not completely

4

satisfied. Should I/we choose not to return the warranty for cancellation within the 30-day period, I/we hereby waive the right to later assert any inapplicability of the terms and conditions of the Warranty Document." Within the same paragraph, it also includes a jury waiver and quasi-arbitration agreement stating that the purchaser accepts "binding alternative dispute resolution processes . . . contained therein," referencing the warranty document to be mailed upon receipt and acceptance of the application by Centricity. At its bottom, the form includes a checklist for "a complete application," with a box to check each for: the homeowner(s) signed application, the builder's signed application, the submitted enrollment fee, and a provided copy of the application to the homeowner. The application also warns that any missing information would delay the issuance of the warranty documents.[1]

In regard to the closing on the Emmett's home, BNI did not follow its usual practice. Although Daniel signed the Centricity application, it was neither signed by Ashleigh nor BNI, who are the only parties to this litigation. Still, BNI closed on the sale of the property as provided under the New Home Contract. BNI did not discover the unsigned application for more than a year, when Centricity flagged it in an email.[2] Ashleigh and her realtor deny ever receiving any document at any time concerning the terms of an express warranty. Daniel denies that he was given the express warranty terms before or at closing. After moving into the house, Ashleigh submitted several repair

---

[1] Among other terms, the reverse side of the form states, "I hereby waive the right to later assert any inapplicability of the terms and conditions of the Warranty Document"—to be provided later—including "alternative dispute resolution processes, including but not limited to arbitration, contained therein." The application further states that "any and all claims, whether contractual or otherwise, are controlled by the express terms, conditions and exclusions contained in the Warranty Document." The application also states, in a circular fashion, that "only upon Centricity's receipt and acceptance of this Application" would Centricity "issue and mail to me/us the Warranty Documents [sic]."

[2] Mills testified: "Upon inquiry, BNI was informed by Centricity in August 2022 that the Emmetts were enrolled in the Centricity Warranty program and that the Centricity Warranty was in effect." Centricity noted in an email: "Owner signature. It is also best practice to have BOTH owners sign the application. I noticed that you only had Mr. Emmett sign this application. Truly, any party signing the closing documents should also sign the warranty application/acknowledgement form." The application states at the top and bottom, in bold colored type: "Remember: Homeowner must sign the Warranty Coverage Application."

requests directly to BNI, not through a claims process provided by Centricity. BNI responded to Ashleigh's requests without mentioning the warranty or suggesting she was bound by it. Months later, Ashleigh's counsel sent BNI a pre-suit demand letter seeking statutory remedies for unrepaired items, making a passing reference to a "one-year warranty period," not to a Centricity Warranty or its terms.[3]

Mills regretted that no one—to include the title agent, the realtors, and the Emmetts—had brought it to his attention that Ashleigh had not signed the warranty application. He stated, "[h]ad BNI been so informed, the transaction would not have closed." After making a counteroffer regarding disputed repairs, BNI "clarified" for the first time that the Centricity Warranty applied to all repairs and governed construction performance standards for the home.

Based on the terms of both contracts, it is clear that neither agreement incorporated nor referred to the other. To the contrary, they both stand firmly on their own terms. The New Home Contract is a standard Texas Real Estate Commission (TREC) form lacking an arbitration provision and it disavows express warranties as no separate agreement is referred to therein. It states: "[e]xcept as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties." This language plainly does not incorporate nor permit such incorporation of a "separate writing" unless the writing is expressly set forth in the agreement. *See Kellogg Brown*, 166 S.W.3d at 738 (finding a nonsignatory not bound even though subcontract referred to and incorporated specifications of contract).

---

[3] One sentence refers to a warranty period: "Exhibit A details additional items of defective construction that have become evident in the Emmett's one year warranty period." The letter neither specifies a reliance on the Centricity Warranty nor common-law implied warranties. The list of defects overlaps to some extent with the subject of the warranty but it does not appear to correspond to any of its terms. Instead, it alleges various property damage and expressly seeks statutory, not contractual, remedies prior to litigation.

Both the New Home Contract and the Centricity Warranty contain standard merger clauses. "A merger clause is a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." *Rieder*, 603 S.W.3d at 96 (internal quotation marks omitted). The New Home Contract's plain language provides that it is "the entire agreement of the parties and cannot be changed except by *their* written agreement. Addenda which are part of this contract are (check all applicable boxes)[.]" (emphasis added) Only three boxes were checked with an "x" on the form: (1) a third-party financing addendum, (2) an addendum concerning the right to terminate due to a Lender's Appraisal, and (3) "Other (list): Intermediary Relationship Notice Exhibit A." The Centricity Warranty includes a similar provision. With language directed at homeowners, the agreement states:

> The Centricity Warranty is independent of the contract between You and Your Builder for the construction of the Home and/or its sale to You. Contract disputes, which are not warranty disputes, as covered under this warranty are not eligible for dispute resolution hereunder. Nothing contained in any other contract between You and Your Builder can restrict or override the provisions of this Centricity Warranty.

The New Home Contract cannot reasonably be construed as supporting a conclusion that it was executed for the sole purpose of entering the limited warranty agreement. Instead, the contract evidences the homeowners' intent to purchase a newly-built home based on contract documents, while simultaneously laying out the responsibilities and obligations with respect to the parties. Similarly, the Centricity Warranty stands apart from the New Home Contract. The Centricity Warranty declares it is "independent" of the "contract between You and Your Builder for the construction of the Home and/or its sale to You." Further supporting the conclusion that the two agreements are independent of one another is the inclusion of merger clauses in both agreements.

7

The existence of a merger clauses in both the New Home Contract and the Centricity Warranty confirms the agreements are separate and distinct from one another and the parties did not intend otherwise. *Id.* at 97. The inclusion of a merger clause in the New Home Contract bound BNI, Daniel, and Ashley to that agreement and made the agreement's terms the final, binding, and superseding obligations each had agreed to undertake with respect to the purchase of the newly-built home. *See id*. The same principle operates with regard to the warranty coverage provided by the express, limited warranty, making its terms final and superseding of any and all prior agreements by and between Centricity and only those parties who properly completed the application form. *See id*. And because the two agreements clearly impose distinct obligations about matters not addressed within their provisions, I would conclude the inclusion of merger clauses in each supports the separateness of the two instruments. Indeed, to conclude otherwise, the merger clause of each is rendered a nullity because it would be impossible for the contracts to be *complete and final*, *independent*, or *the entire agreement*, if it is deemed that they must be read together.

## B. Unification violates contract terms

The majority supports application of the unified instrument doctrine but it does so by relying on cases that found incorporation by reference through contract terms. *See Stevenson v. Roberts*, No. 14-20-00075-CV, 2021 WL 2460577, at *3 (Tex. App.—Houston [14th Dist.] June 17, 2021, no pet.) (mem. op.) (holding that an "addendum" with a forum selection clause was part of an employment agreement "by virtue of its title and its plain language"); *Christerson v. Speer*, No. 01-16-00469-CV, 2017 WL 1520449, at *5 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.) (holding a home purchase agreement, deed of trust, and financing disclosure that plainly referenced each other provided sufficient notice of the financial terms for purposes of the discovery rule); *Famous Water Co., L.P. v. Aquio Sols. Intermediate Holdings, LLC*, No. 02-23-00329-CV, 2024 WL 2971686, at *10–11 (Tex. App.—Fort Worth June 13, 2024,

8

no pet. h.) (mem. op.) (considering that the use of "shall" in a nonbinding letter of intent along with the use of "may" in the final contract merely to "show that the parties understood how to use 'shall' in those various instruments if 'shall'—rather than 'may'—is what they intended"). But rather than incorporate by reference, the contracts at issue here declared their independence from each other and profess completeness based on the objective text.

Indeed, the unified instrument doctrine is simply an extension of incorporation by reference that applies "when an examination of all the writings shows that the one executed by the defendant was signed with reference to the other writings." *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968). In *Owen*, the Texas Supreme Court extended the doctrine of incorporation by reference to permit several writings to be read together when they appeared to relate to the same transaction. *Id*. at 166–67. Importantly, however, the determination was based on "internal evidence," meaning "from their terms." *Id*. The doctrine's "only permissible" application was established "where the signed paper at the time of the signature can be shown from its contents to be based on an adoption of a then existing unsigned paper." *Id*.

In my view, the majority's decision today runs the risk of impermissibly adding contract terms contrary to parole evidence limitations. There are three foundational rules implicated here that prevent courts from adding terms. First, as earlier mentioned, the merger doctrine—memorialized in the entireties clause in both agreements—precludes supplementing a written agreement with additional terms. *Smith v. Smith*, 794 S.W.2d 823, 827–828 (Tex. App.—Dallas 1990, no writ). Second, our contract-construction rules prevent courts from considering parol evidence—whether oral or written—to vary or add to unambiguous contract language. *West v. Quintanilla*, 573 S.W.3d 237, 244 (Tex. 2019). Third, the parol evidence rule—a substantive rather than evidentiary rule—bars enforcement of contemporaneous or prior agreements that contradict or modify an integrated agreement. *Id.*

9

Here, I would conclude that the New Home Contract cannot be read together with the Centricity Warranty without violating these foundational principles. *Anthony Indus., Inc. v. Ragsdale*, 643 S.W.2d 167, 174 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) ("We have been cited to no case, and we have found none, holding warranties, either express or implied, can be added to a written contract by parol testimony."). The parol evidence rule does not preclude enforcement of a collateral agreement that is "supported by separate consideration and that the parties 'might naturally' make separately under the circumstances." *West*, 573 S.W.3d at 245. A collateral agreement is by definition separate from another agreement and not part of a unified instrument: a collateral agreement "must not be so clearly connected with the principal transaction as to be part and parcel thereof." *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied). In addition, collateral agreements are "not inconsistent with and do not vary or contradict the express *or implied* terms or obligations" of the underlying agreement. *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010) (emphasis added).

All of the evidence put forth regarding the express warranty is extrinsic to the purchase agreement. And to the extent BNI's disclaimer of warranties "contemplates" a separate warranty, it does not fall within a narrow exception for separate or "collateral" agreements. The Centricity warranty cannot be considered a collateral agreement because it directly supplants the implied warranties provided by law based on the purchase agreement.

Texas courts have consistently rejected similar attempts to avoid the parol evidence rule where parties attempt to insert new terms, including warranties and arbitration provisions, under the guise of documentation necessary to finalize a sale. "Such additional terms contained in forms transmitted subsequent to contract formation do not become a part of the contract[.]" *Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 804–05 (Tex. 1991). Notably, *Tubelite* involved a sale under

10

the U.C.C., which itself includes a modified parol evidence rule allowing terms to be included through a "battle of the forms" prior to formation. *Id.* at 803. Yet the Supreme Court concluded that "under the common law or the Code," unilateral post contract formation conduct cannot supply additional terms. *Id.* at 804.

Sister courts including the Austin Court of Appeals have rejected similar efforts to add arbitration provisions through post-contract documentation. *See Int'l Metal Sales, Inc. v. Glob. Steel Corp. & Glob. Steel Corp.*, No. 03-07-00172-CV, 2010 WL 1170218, at \*11 (Tex. App.—Austin Mar. 24, 2010, pet. denied) (mem. op.) (considering forum-selection clause in post-contract invoices); *see also Left Gate Prop. Holding, LLC v. Nelson*, No. 14-19-00247-CV, 2021 WL 1183863, at \*1 (Tex. App.—Houston [14th Dist.] Mar. 30, 2021, no pet.) (mem op.) (considering an arbitration provision in series of documents "finalizing" the transaction where "there were no additional documents required to 'finalize' the automobile sale transaction"); *Nationwide Coin & Bullion Reserve, Inc. v. Thomas*, 625 S.W.3d 498, 506 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (considering arbitration provision in "Purchase Agreement" provided after transaction was completed); *In re Gaudet*, 625 S.W.3d 887, 894 (Tex. App.—El Paso 2021, orig. proceeding) (rejecting "attempt[] to tack emails and other conduct onto the Builders Deposit Receipt to support the existence of a contract"). This Court has also applied the parol evidence bar in a case involving a similar disclaimer of warranties stating that the seller assumed "only such warranty obligations to Buyer as are set forth on the face of this order or in a *separate written instrument*, if any." *Southerland v. Ne. Datsun, Inc.*, 659 S.W.2d 889, 891–92 (Tex. App.—El Paso 1983, no writ) (emphasis added). There, we held the disclaimer "unambiguously" precluded any consideration of parol evidence regarding warranties. *Id.* at 892.

11

**C.  Ashleigh is not bound by her attorney's demand letter**

The majority also places weight on a statement by her attorney whereby she purportedly accepted the Centricity warranty. Even if the issue of agency had been properly raised, the record does not support acceptance. The attorney did not state that Ashleigh accepted the warranty; rather, she merely notified BNI of defects within the one-year warranty period—defects equally covered by the implied warranty of good workmanship.

Referring to the attorney letter is problematic for several reasons. First, the letter amounts to parol evidence intended to alter the express signature and delivery requirements of the Warranty Application. Second, there is no basis to conclude that the attorney had authority to accept a contract. BNI acknowledges that agency is a distinct legal theory for binding a nonsignatory to an arbitration agreement—which it neither pleaded, proved, nor argued on appeal. The letter was a pre-suit notice plainly intended to preserve Ashleigh's rights, not to waive them. Just because a party hires an attorney to make demands does not indicate authority to compromise substantial rights. *Chavez v. Kansas City S. Ry. Co.*, 520 S.W.3d 898, 900–01 (Tex. 2017). Attorneys, as a matter of law, have no implied authority to accept contract offers so as to bind their clients, particularly when a contract dispute lies at the center of the representation. *Youngberg v. El Paso Brick Co.*, 155 S.W. 715, 718 (Tex. App.—El Paso 1913, no writ). This principle is especially evident when the form of the contract expressly calls for the signature of the principals. *Schafer v. Barrier Island Station, Inc.*, 946 F.2d 1075, 1079 (4th Cir. 1991). Moreover, statements made during settlement negotiations are generally inadmissible to establish the existence of an agreement. *Int'l & G.N.R. Co. v. Ragsdale*, 2 S.W. 515, 517 (Tex. 1886); *see also* Tex. R. Evid. 408.

Attorneys also lack implied authority to submit a case to arbitration. There is no presumption of authority to arbitrate through attorney conduct. *Morbia v. Trade Res., Inc.*, No. 14-

12

21-00712-CV, 2023 WL 5034640, at *2 (Tex. App.—Houston [14th Dist.] Aug. 8, 2023, no pet.) (mem. op.) (assuming without deciding that attorney lacked authority to agree to binding arbitration). As the Fifth Circuit has observed, "[f]ew, if any, would argue that, without consulting his client, an attorney has implied authority to submit his cause to arbitration[.]" *U.S. ex rel. Goldsby v. Harpole*, 263 F.2d 71, 83 (5th Cir. 1959).

After examining the facts surrounding the execution of both agreements, I would conclude the New Home Contract and the Centricity Warranty were executed for separate and distinct purposes. Thus, the two agreements cannot be read together to form one unified instrument.

## II. DO CONTRACT AND AGENCY PRINCIPLES SUPPORT COMPELLED ARBITRATION?

It is undisputed that Ashleigh did not personally sign the Centricity Warranty application, though it expressly required signatures from her, Daniel, and BNI. Nonetheless, BNI argued that Daniel's signature alone sufficed for both homeowners, and BNI's signature was unnecessary since it sent a check for payment of the warranty fee at closing. Also, relying on nonsignatory theories, BNI contends Ashleigh "directly benefitted" from the Centricity Warranty by living in a warranty-protected home, that she asked for and received repairs from it, and she cannot now avoid the arbitration agreement included in the contract. I disagree on all fronts.

### A. Signatures expressly required

Before courts may consider extrinsic evidence of acceptance by conduct or other theories, they must examine whether the contract requires a signature. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 690 (5th Cir. 2018). As the Fifth Circuit put it, this analysis begins and ends with the contract's express language. *Id.* at 689 (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). Here, the warranty application form, which is expressly a part of the Centricity Warranty, includes signature and delivery requirements. The majority's

13

conclusion that Ashleigh is bound without her signature and without proof of delivery contradicts the text of the agreement and departs from these precedents.

First, the warranty application begins with classic language of a condition precedent: "UNLESS . . . THE APPLICATION IS SIGNED . . . YOUR HOME WILL NOT BE ENROLLED." The instructions attached to the application emphasize in bold: "Homeowner must sign the Warranty Coverage Application." At the bottom, the application states that a complete application must include "Homeowner(s) Signed" and "Builder Signed" copies. An acknowledgment above a signature block with lines for BNI, Daniel, and Ashleigh states that "by signing this application I/we affirm" we have read and understand the important Homeowner's Acknowledgment on the reverse side of the application. In turn, the reverse side of the form acknowledges that "only upon Centricity's receipt and acceptance of this Application" and the enrollment fee, Centricity will issue and mail "me/us the Warranty Documents." The warranty document itself confirms the "entire warranty contract" between "You, Your Builder, and Centricity," consists of the "Warranty Coverage Application," the Warranty Confirmation page, any Warranty Amendments and the "Warranty Document."

The language in the warranty application is significantly more than what Texas courts, particularly the Austin Court of Appeals, have held is sufficient to create a condition precedent to contract formation. *St. David's Healthcare P'ship, LP v. Fuller*, 627 S.W.3d 707, 710–13 (Tex. App.—Austin 2021, pet. dism'd) (recognizing that "parties to a contract may express an intent to require signatures as a condition precedent to the contract becoming effective"). The Austin court rejected arguments that a nonsignatory could be bound to a separate contract because the plain language of their agreement established they intended to require any amendment to be signed by both parties. *Id.* at 711. BNI does not dispute Ashleigh's signature was a condition precedent to the warranty's formation. The signature requirement in this case is even clearer than

14

the ones in the cited authorities. Even though Ashleigh and Daniel are spouses, BNI provided no evidence that one spouse is an agent of the other. *See* Tex. Fam. Code Ann. § 3.201 (providing that spouses are not agents of one another based solely on the marriage relationship). Nor does BNI contend that it pleaded or proved satisfaction of this condition. Its motion to compel did not identify any evidence showing that the signature condition was satisfied or waived. Ashleigh raised the issue in response, yet BNI remained silent in reply.

Second, the warranty application requires that "the Warranty Documents" be mailed to her home. BNI does not dispute that delivery of the warranty documents was a condition, indeed, an essential element of a binding agreement. Nor does it dispute that it failed to mail the document to Ashleigh herself or to her home address. BNI merely offered a purported screen shot of a computer entry indicating "success sending WCP via electronic delivery (email) Docs printed 6/19/2024 10:12:21 AM by JAdams."[4] BNI insists that delivery by mail to the home address was merely a condition subsequent, not a condition precedent. This assumes a warranty agreement was formed at the time of the application, yet it relies solely on post-closing conduct to prove acceptance.

The majority, citing *In re Hill*, No. 01-02-00186-CV, 2002 WL 1165032, at *1 (Tex. App.—Houston [1st Dist.] May 30, 2002, orig. proceeding), concludes that Centricity could unilaterally disregard the missing signatures and failure to mail to the home address. But *Hill* is wholly inapposite. A buyer filled out an application for a 10-year warranty at or near the time she bought a home. *Id*. The text of the application required her to *both* sign the form and to sign "her initials" in the space provided in a box near the bottom of the form confirming her acknowledgment that she had read and understood the arbitration provision that was included in a warranty book. *Id*. The form also required a signature of the builder. *Id*. Ultimately, the buyer signed the

---

[4] The identity of "JAdams" is not explained in the record.

application but other parts of the form were not properly completed. *Id*. For example, only blank lines appeared for the buyer's initials and dates were not filled in. *Id*. The court determined that the face of the application gave the buyer notice of the arbitration provision for unresolved warranty issues, and the buyer "signed the application for the warranty." *Id*. at \*2. In other words, the court concluded the box requiring initials was intended for the benefit of the seller, and the buyer who had otherwise signed the form could not invalidate the agreement based solely on her lack of including her initials and a date. *Id*. Ashleigh, by contrast, never signed the warranty application—not in whole, not in part. Nor was she provided a copy of the warranty book, or even a sample warranty, at or near the time of closing. The central facts in *Hill* are missing here.

*Hill* is also irreconcilable with *Fuller* and other caselaw regarding waiver of conditions precedent. *See Fuller*, 627 S.W.3d at 711 ("[P]arties to a contract may express an intent to require signatures as a condition precedent to the contract becoming effective."). The Texas Supreme Court has long rejected the idea, holding specifically that a party could not unilaterally waive a customer's required signature on a certificate of deposit. *Ames v. Great Southern Bank*, 672 S.W.2d 447, 449–50 (Tex. 1984). The same logic applies here.

Nor has BNI shown it satisfied the condition precedent of its *own* signature. The Austin Court of Appeals has held that a party's own signature was a condition precedent to enforcement. *Fuller*, 627 S.W.3d at 712–13 (denying arbitration where movant failed to sign agreement that required signatures as a condition precedent); *Rockstar Remodeling & Diamond Decks, LLC v. Taddia*, No. 03-19-00657-CV, 2020 WL 1540740, at \*1–2 (Tex. App.—Austin 2020, no pet.) (same); *Hi Tech Luxury Imports, LLC v. Morgan*, No. 03-19-00021-CV, 2019 WL 1908171, at \*2 (Tex. App.—Austin 2019, no pet.) (same). To the extent that *Hill* suggests that required signatures by either party may be dispensed with by a movant, it conflicts with precedent of our transferor court. *See* Tex. R. App. P. 41.3.

16

The approach of the Austin Court of Appeals, which follows the Fifth Circuit, controls here. If BNI could unilaterally waive its own signature, it could reserve the right to selectively enforce or disregard the arbitration and warranty agreement. A nonsignatory moving to compel arbitration could "have it both ways—argue that it did not intend to be bound because it did not sign the agreement or it did because it kept the agreement and sought to compel arbitration." *Huckaba*, 892 F.3d at 691.

Even if the missing signatures were waivable by extension of *Hill*, BNI did not plead waiver or offer evidence of it. *Hill* cited testimony from two hearings that presumably supported its conclusion that the checkboxes of a contract were waived. 2002 WL 1165032, at *1. BNI's attempt to suggest that the conditions precedent were waived for the first time on appeal fails both procedurally and substantively. Waiver must be proved by conduct that is unequivocally inconsistent with enforcement of the condition, *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 673 (Tex. 2020), and must not prejudice the other party, *In re Universal Underwriters of Texas Insurance Co.*, 345 S.W.3d 404, 411–12 (Tex. 2011) (orig. proceeding). BNI did not attempt to meet that burden. Generalized conduct suggesting mutual assent is not enough; waiver must be established by evidence "directly tied to the condition precedent[.]" *Energy Transfer Partners, L.P. v. Enter. Products Partners, L.P.*, 593 S.W.3d 732, 741 (Tex. 2020). Otherwise, the parties' intent expressed in their agreements would no longer be the controlling inquiry and conduct would become a trap for the unwary. *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 199 (Tex. 2021).

Texas law does not permit parties to bypass conditions precedent through after-the-fact assertions of waiver. Because neither of the two conditions precedent—signature and delivery—were satisfied, and because BNI neither pleaded nor proved waiver, BNI could not establish an

17

enforceable arbitration agreement without a completed application form and proper delivery of the warranty document.

### B. Other nonsignatory theories

#### (1) The third-party beneficiary theory does not apply

BNI argues that Ashleigh is bound to arbitrate as a third-party beneficiary of the warranty. This argument fundamentally misapprehends the role of third-party beneficiaries, who are entitled to elect whether to accept the contract or to rely on their common-law rights instead. *See In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678 (Tex. 2006) (orig. proceeding). This doctrine of election preserves autonomy: beneficiaries may pursue the benefits of a warranty contract, or they may reject those benefits and assert claims under common law, but not do both. In *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005) (orig. proceeding). In *Weekley*, the Supreme Court held that a third-party beneficiary who elects to "pursue a claim 'on the contract' . . . must pursue all claims—tort and contract—in arbitration." *Id.* at 132. Those who do not sue on the contract "may pursue the tort claims in court," but only if they have not "consistently and explicitly insisted on being treated as a party" to the contract. *Id.* at 132, 135 n.46. The key determinant is whether the third party affirmatively invoked the contract's benefits.

Ashleigh exercised her right to disclaim the Centricity warranty. Her pleadings did not rely on the warranty, and the record contains no act or statement in which she demanded relief under its terms. She neither referred to the warranty in her individual communications or in her court filings. To the contrary, her conduct and sworn statements explicitly disavow any reliance on the Centricity Warranty and instead invoke BNI's common-law warranty of good workmanship.

#### (2) The direct benefits estoppel theory also does not apply

A nonsignatory may be bound to an arbitration agreement based on conduct through the doctrine of direct benefits estoppel. *Taylor Morrison of Texas, Inc. v. Ha*, 660 S.W.3d 529, 532–

18

33 (Tex. 2023) (quoting *Weekley*, 180 S.W.3d at 132) (providing that a nonsignatory may be bound by conduct that "deliberately seeks and obtains substantial benefits from the contract itself"). Even though Ashleigh is a signatory to the New Home Contract, which lacks an arbitration clause, BNI contends she accepted the warranty merely by living in the home and requesting home repairs. Under a rubric of acceptance by conduct, BNI's contention cannot be squared with cases it cites.

*Weekley* stands for the proposition that homeowners are not bound to arbitrate under an express warranty merely by seeking repairs. *Weekley*, 180 S.W.3d at 133. The Court expressly rejected the notion that either requesting or receiving repairs covered by a warranty sufficed to demonstrate assent. It required more explicit affirmative conduct tied to the warranty— "claiming the authority" of the contract and "demanding compliance with provisions of the contract." *Id.* The Court emphasized that direct benefits estoppel applied only because the plaintiff had obtained actual benefits under the contract when the builder "agreed to comply." *Id.* at 134. It further observed that the claims of family members were "explicitly based on the contract." *Id.* at 133.

The premise of *Weekley*'s analysis was a homebuyer retains the right to proceed under common law *despite requesting repairs that are covered under an express warranty*. The Fourth Circuit has held the implied warranty of good workmanship arises "from a contractor's role as a builder, not 'from the construction contract to which the builder is a party.'" *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 163–64 (4th Cir. 2004). That is, home builders bear two sets of obligations: one under the contract, and one under general legal duties imposed by law. *Id.* at 163. Therefore, regardless of whether the plaintiff in *Griffin* "could have" asserted an express warranty claim, it was free to stand on its common-law right to file an implied warranty claim. *Id.*

Ashleigh did no more than the plaintiff in *Griffin* and took none of the actions required by *Weekley*. She did not invoke the authority of the Centricity Warranty. She did not demand

19

compliance with its terms. She did not receive repairs under its terms, and her attorney's letter neither invoked it. Nor did her husband file a claim under the Centricity Warranty or did he even appear in the lawsuit.

The Austin Court of Appeals—the transferor court in this instance—has adhered to *Weekley* by refusing to infer assent by conduct in the absence of explicit and affirmative reliance on a builder's warranty. Specifically, it has rejected a motion to compel arbitration when the defendant offered only the purchase agreement. *Toll Dallas TX, LLC v. Dusing*, No. 03-18-00099-CV, 2019 WL 2127885, at *2 (Tex. App.—Austin May 16, 2019, no pet.) (mem. op). Only when the defendant returned with extensive new evidence did the court find direct benefits estoppel: including a price reduction amendment in consideration of the alleged defect, an attorney demand letter citing the warranty as the source of obligation, and specific repairs obtained "per the terms of our warranty." *Id.* at *3–5. Here, Ashleigh did not seek or obtain any amendment to the warranty, did not obtain repairs "per the terms of the warranty," and sent no notice of claim invoking its provisions.

Given the narrow strictures of *Weekley* and *Toll Dallas*, BNI relied in its briefing on a standard for direct benefits estoppel espoused in *Ha*, 660 S.W.3d at 533. In that case, the Texas Supreme Court held that a nonsignatory spouse, who was not a signatory to a home purchase agreement, was estopped from denying the agreement's arbitration clause where she (1) lived in the home her spouse purchased under that agreement, and (2) she jointly sued alongside her husband on factually intertwined claims. *Id.* at 534–35. By contrast, Ashleigh is a signatory to the New Home Contract, she sued alone to enforce its terms, and she relied on implied warranty claims grounded in statutory and common law that stem from her contractual claims. Thus, her mere use of a home she jointly owned did not establish her consent to the terms of a separate warranty

20

agreement that was purportedly entered into by her husband alone, and without the builder's express agreement.

The majority concludes that Ashleigh has waived conditions precedent and elected to waive her jury rights. Like waiver, the election-of-remedies doctrine turns on deliberate invocation of contractual rights, not offhand references to warranty periods during negotiations. As with any election, there must be a knowing choice. Ashleigh made hers. She declined to accept the Centricity warranty. She cannot be forced into arbitration based on an agreement she rejected.

## III. CONCLUSION

For all these reasons, I would affirm the trial court's order denying BNI's motion to compel arbitration.

GINA M. PALAFOX, Justice

August 29, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting

21